## AFFIDAVIT OF TASK FORCE OFFICER MICHAEL C. ALVARADO

I, Michael Alvarado, being duly sworn, depose and state as follows:

## INTRODUCTION

1.      I am a Lieutenant with the Massachusetts Department of Correction ("MA DOC"). I have served with the MA DOC from 2006 to present.  Since 2012, I have served as an investigator in the MA DOC's Office of Investigative Services.  In addition, since September 2015, I am assigned as a Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI"), Boston Division's North Shore Gang Task Force ("NSGTF").  As a TFO, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

2.      I have received training and experience in a variety of investigative methods to include interview and interrogation, arrest procedures and search and seizure.  Since my assignment to the NSGTF as a TFO, I have received additional training and experience in interviewing and interrogation, arrest procedures, search and seizures, gangs, narcotics, search warrant applications, and various other investigative techniques and methods.

3.      I have participated in numerous investigations focusing on controlled substances, trafficking, gangs, and illegal firearms.  I have conducted covert surveillance of suspected drug traffickers, interviewed numerous individuals involved in gangs and drug trafficking, participated in several Title III wiretap investigations as a monitor and member of surveillance teams, participated in the execution of numerous state and federal search and arrest warrants involving drug traffickers and violent offenders, and I have participated in the seizure of numerous firearms and controlled dangerous substances.

4.     Over the past fifteen years, I have been involved in numerous state and federal narcotics and gang investigations.  As a result of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, the organization of drug conspiracies, traditional gang methodologies and structures, as well as illegal firearms sales.

5.     I have participated in various aspects of firearm-related investigations.  For example, I have participated in firearm investigations utilizing confidential informants.  I have assisted in preparing affidavits for federal court in support of applications for criminal complaints, search warrants, tracking warrants and Title III wire intercepts.  I have also conducted and coordinated electronic and physical surveillance of individuals involved in violations of federal firearms laws.

6.     I am currently involved in an ongoing investigation into felon in possession of ammunition, in violation of Title 18, United States Code, Section 922(g)(1) and dealing firearms without a license, in violation of Title 18, United States Code, Section 922(a)(1)(A)(the "TARGET OFFENSES") by Zachary ZELLA (born 1993) and Mickie SIMMONS (born 1991).

7.     This affidavit is submitted pursuant to Rules 3 and 4 of the Federal Rules of Criminal Procedure for criminal complaints and arrest warrants charging ZELLA and SIMMONS with the TARGET OFFENSES.

8.     This affidavit is further submitted pursuant to Rule 41 of the Federal Rules of Criminal Procedure in support of applications for warrants authorizing the search of:

> (a)     ZELLA's residence at 182 Southbridge Road, Rear entrance, Dudley, Massachusetts, and the curtilage of that property hereinafter "TARGET PREMISES ONE," described in further detail in <u>ATTACHMENT A-1;</u> and

(b) SIMMONS' residence at 42 Gay Road, Brookfield, Massachusetts, and the curtilage of that property, including, but not limited to, the disabled vehicles present on the property, hereinafter "TARGET PREMISES TWO"

for contraband and evidence, fruits, and instrumentalities of violations of the TARGET OFFENSES, which items are more specifically described in <u>ATTACHMENT B</u> of this Affidavit.

9.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement personnel and witnesses. This affidavit is intended for the limited purpose of setting forth sufficient probable cause for the requested complaints, arrest warrants and search warrants and does not set forth all my knowledge about this matter. In addition, where amounts are set forth in this affidavit, they are set forth as approximations. Similarly, dates and times are approximations, and should be read as on about, in about, or at about the date or time provided.

## **STATUTORY AUTHORITY**

10.     As noted above, this investigation concerns alleged violations of the following:

(a) Title 18, United States Code, Section 922(g)(1) prohibits any individual who has been convicted of a crime punishable by imprisonment for a term exceeding one year to possess ammunition; and

(b) Title 18, United States Code, Section 922(a)(1)(A) makes it a federal offense for any individual who is not a licensed dealer within the meaning of Title 18, United States Code, Chapter 44, to engage in the business of dealing in firearms.

## PROBABLE CAUSE SUMMARY

11.     On March 7, 2022, ZELLA and SIMMONS (both convicted felons who served more than a year in prison making them each aware of their status as felons) sold an FBI Confidential Human Source (CHS-1[1]) one (1) Polymer80 Inc., Model PF940V2, 9mm pistol with one (1) magazine, which was later determined to be a Privately Made Firearm ("PMF"), also known as a "ghost gun," meaning a firearm that has been manufactured by an individual and not by a firearms manufacturing company.  ZELLA also provided CHS-1 with thirty-seven (37) rounds of 9mm ammunition.

12.     Subsequently, on April 12, 2022, CHS-1 purchased two (2) Polymor80 Inc. 9mm pistols from SIMMONS and ZELLA: one marked Model PF9405C, 9mm pistol with one magazine; and the other marked Model PF940V2, 9mm pistol with one magazine.  These two pistols were determined to be PMFs.  SIMMONS and ZELLA also provided 15 rounds of 9mm ammunition.

13.     Finally, on May 4, 2022, CHS-1 purchased one (1) Polymer80 Inc., Model PF940V2, 9mm pistol with three (3) magazines and three (3) rounds of 9mm ammunition from ZELLA.  This pistol also contained a Gamo laser sight.  This pistol was determined to be a PMF.

---

[1] Confidential Human Source 1 ("CHS-1") began cooperating with law enforcement in 2021.  The information provided by CHS-1 has been found to be reliable and has been corroborated by controlled firearms purchases from ZELLA and SIMMONS.  CHS receives financial compensation in return for cooperation.  CHS-1 has convictions for assault on a family / household member (2017), resisting arrest (2017), bomb hoax (2017), assault and battery dangerous weapon (2015), assault (2015), larceny (2014), intimidation (2014), assault and battery (2014), threatening (2014), resisting arrest (2014), assault and battery police office (2014), vandalism (2014), disorderly conduct (2012), carrying a dangerous weapon (2012), assault and battery dangerous weapon (2011), larceny (2010), assault and battery/intimidation (2010), disorderly conduct (2010), trespassing (2010), as well as juvenile convictions.

## PROBABLE CAUSE

14.     As a preliminary matter, I have reviewed the criminal histories for both ZELLA and SIMMONS.  Both are convicted felons who have served more than one year in jail meaning both knew that they were previously convicted in a court of a crime punishable by imprisonment for a term exceeding one year when they engaged in the criminal conduct detailed herein.

15.     Specifically, in 2016 and 2017, ZELLA was convicted in Dudley and Worcester District Courts with drug charges and he served two years in custody.

16.     In 2014, SIMMONS was convicted in Dudley District Court of Breaking and Entering, Larceny, and Conspiracy and he was initially sentenced to 30 months.  That sentence was later revised and revoked to 18 months.

### A.      CONTROLLED PURCHASE #1 – MARCH 7, 2022

17.     On Wednesday March 2, 2022, at approximately 4:28 p.m., CHS-1 exchanged text messages with ZELLA via ZELLA's cell phone number ███████1793.  Within these text message exchanges, CHS-1 inquired with ZELLA about purchasing a firearm and ammunition. The followingwas text exchange was sent from CHS-1 to ZELLA:

| | | |
|---|---|---|
| 4:28 p.m. | CHS-1: | What can u do |
| | CHS-1: | The most I can do is a band |
| 5:04 p.m. | CHS-1: | I can do 1300$ and slid rns just lmk |

18.     On Thursday, March 3, 2022, at approximately 2:21 p.m., ZELLA replied to CHS-1, as set out below:

| | |
|---|---|
| 2:21 p.m. | ZELLA: No doubt I'ma go talk to the homie tomorrow. |
| 2:27 p.m. | CHS-1: Bet |
| 4:17 p.m. | ZELLA: Dude ain't trying to give up CDS WIT THE PLAYSTATION |
| | ZELLA: I'm like you can't sell a console wit no games |
| | ZELLA: [crying laughing face emoji] |
| 4:19 p.m. | CHS-1: As long as that shit has the game with it idc about extra |
| | ZELLA: Nah I mean the plates are Gucci but he being shellfish |

with his food

CHS-1: Ya if I can get one full thing I'm fine

ZELLA: No doubt lmk too dude selling em for $3 a pop like nah

4:23 p.m.   CHS-1: Na 3$ is alot so what with the ccd in the PlayStation

CHS-1: 1300$

CHS-1: Or no cd. At allnothing

CHS-1: I'll be happy if one full

ZELLA: What color you want tho there chrome and black chrome and army green or black on black

CHS-1: Army green

CHS-1: I can slid on Tuesday Wednesday

CHS-1: I started this new job

ZELLA: Okay lmk for sure tho fam I held the other down for you for mad long

CHS-1: Illcome thoe

ZELLA: Ight bet fam

CHS-1: On my grams I'll slid

ZELLA: HMU Monday and lmk

19.     When ZELLA wrote "Dude ain't trying to give up CDS WIT THE PLAYSTATION" and "I'm like you can't sell a console wit no games," CHS-1 understood the references to "PLAYSTATION," "console" and "CDS" or "games" to be referring to firearms and ammunition meaning you cannot sell a firearm without ammunition. When ZELLA wrote "Nah I mean the plates are Gucci but he being shellfish with his food," CHS-1 understood ZELLA to mean the firearms were good but the gun supplier (being *selfish* ("shellfish" a typo in the text) with his "food" or ammunition) did not want to sell his ammunition. When ZELLA wrote "No doubt lmk too dude selling em $3 a pop like nah," CHS-1 understood ZELLA to mean his (ZELLA's) supplier is charging $3.00 per round of ammunition and ZELLA believes this price is too high.

20.     On March 6, 2022, ZELLA forwarded the CHS-1 three photographs displaying a firearm and one magazine. CHS-1 identified ZELLA as the individual holding the firearm in the photograph through ZELLA's tattoos.



21.     As noted in the summary above, on March 7, 2022, ZELLA and SIMMONS sold

CHS-1 a PMF and 37 rounds of 9 mm ammunition.  That morning, prior to the controlled purchase,

ZELLA contacted CHS-1 via text message.  ZELLA provided his home address as TARGET

PREMISES ONE.[2]  CHS-1 and ZELLA had previously agreed that CHS-1 would travel to

TARGET PREMISES ONE to purchase the PMF and ammunition.  CHS-1 and ZELLA agreed on

---

[2] During the course of this investigation, ZELLA referred to TARGET PREMSISES ONE as "his crib."
According to online property records, the residential building located at 82 Southbridge Road, Dudley, MA
is a 2-family duplex. TARGET PREMISES ONE is comprised of the rear unit only.  For each of the three
purchases, surveillance agents and the CHSs observed ZELLA at TARGET PREMISES ONE, meaning the
rear entrance.  According to online property records, Lina M. Rios, of Weymouth, Massachusetts purchased
the residential property which includes TARGET PREMISES ONE on February 7, 2022.  I believe based
on available information that ZELLA is a tenant at TARGET PREMISES ONE.  National Grid utility
subscriber information shows Stacy Boisvert resides at 182 Southbridge Rd., Rear, Dudley, MA. Boisvert
is ZELLA's mother.   Another individual with no known connection to ZELLA or his mother, Joshua Cruz
is listed as resident of 182 Southbridge Rd., Front according to National Grid records.  It should be noted
that ZELLA's DMV records and his vehicle registration return to a different address, 51 Stony Brook Drive,
Southbridge, Massachusetts.  Upon information and belief, the Southbridge address belongs to ZELLA's
family members.

a price of $1,400 for the PMF and ammunition.  CHS-1 was accompanied by an FBI Confidential

Human Source (CHS-2[3]) who was responsible for driving CHS-1 to the controlled purchase.

22.     Prior to the controlled purchase, CHS-1 and CHS-2 met with agents at a pre-

determined location.  CHS-1, CHS-2, and their vehicle were searched for contraband and currency

with negative results.  CHS-1 and CHS-2 were provided audio and video recording equipment as

well as $2,000 in official funds to complete the controlled purchase.

23.     Also prior to the controlled purchase, law enforcement set up in the vicinity of

TARGET PREMISES ONE to conduct surveillance.  At approximately 1:40 p.m., ZELLA was

observed outside of TARGET PREMISES ONE wearing a black hat, dark-colored-hooded

sweatshirt and jeans.  ZELLA entered a gold Chevrolet Equinox bearing MA Registration

2GNL33.[4]  ZELLA departed TARGET PREMISES ONE in this vehicle and traveled to a Dunkin

Donuts down the street.  ZELLA then returned to TARGET PREMISES ONE shortly thereafter.

24.     At approximately 1:52 p.m., CHS-1 and CHS-2 arrived at TARGET PREMISES

ONE.  ZELLA exited his vehicle and entered the vehicle with CHS-1 and CHS-2.  CHS-1, CHS-

2 and ZELLA then traveled away from TARGET PREMISES ONE in the CHS vehicle.  During

the ride, ZELLA is clearly visible and discussing firearms and ammunition with CHS-1 and CHS-

2.  CHS-1 is observed counting money for ZELLA.

---

[3] Confidential Human Source 2 ("CHS-2") began cooperating with law enforcement in 2020.  The information provided by CHS-2 has been found to be reliable and has been corroborated by controlled firearms purchases from ZELLA and SIMMONS.  CHS-2 receives financial compensation in return for cooperation.  CHS-2 has convictions for violation abuse prevention order (2019), domestic simple assault (2019), failure to register as a sex offender (2019), unlicensed operation of a motor vehicle (2019), possession of schedule I-V controlled substance (2017), failure to register as a sex offender (2017), failure to register as a sex offender (2016), indecent assault and battery person 14 or over (2014), receiving stolen goods (2011).

[4] As noted above, Fn.3, a query of the Massachusetts Registry of Motor Vehicle (RMV) system revealed this vehicle is registered to ZELLA at 51 Stony Brook Drive, Southbridge, Massachusetts.

25.     At approximately 2:24 p.m., the CHS vehicle arrived and parked at a dirt parking area across from power lines on Gay Road in Brookfield, Massachusetts.  CHS-1 and ZELLA walked across the street to the power lines off Gay Road and met with an unknown individual to CHS-1.   CHS-1 did not bring the audio/video recording device when CHS-1 and ZELLA walked to meet with the unknown individual.

26.     CHS-1 and ZELLA walked approximately 100 yards down the access road into the power line area.  CHS-1 handed $1,400 to ZELLA prior to walking into the power lines.  CHS-1 and ZELLA met with the male (unknown to CHS-1) wearing a black ski mask and dark-colored trench coat.  This individual came from a wooded area on top of a hill to the left of where ZELLA and CHS-1 were standing.  The individual was wearing a 1911 style handgun when he met with CHS-1 and ZELLA.  This firearm contained an extended magazine and red-dot sight.

27.     ZELLA handed the individual the $1,400 provided to him by CHS-1.   The individual handed CHS-1 a handgun from his pants pocket.  The handgun was wrapped in cloth. The individual informed CHS-1 that the individual could acquire any style firearm CHS-1 was interested in.  The individual specifically mentioned having an AR-15 style rifle with multiple magazines and a few hundred rounds of ammunition for sale for $3,000.  CHS-1 and ZELLA walked back to the CHS vehicle and CHS-1, CHS-2 and ZELLA traveled back to TARGET PREMISES ONE.

28.     At approximately 3:03 p.m., the CHS vehicle arrived back at TARGET PREMISES ONE.  ZELLA entered TARGET PREMISES ONE and retrieved thirty-seven (37) rounds of 9mm ammunition and handed the ammunition to CHS-1.

29.     After the controlled purchase, CHS-1 and CHS-2 met with agents at a pre-determined location.  CHS-1 and CHS-2 returned audio and video recording equipment as well as

$600 in official funds that were not needed to complete the controlled purchase, along with the firearm and ammunition.

30.     The evidence was subsequently turned over from CHS-1 to case agents.  The evidence consisted of:

   a.   One (1) black and silver in color 9mm handgun and one empty magazine; and

   b.   One (1) clear plastic bag containing thirty-seven (37) rounds of 9mm ammunition retrieved from inside TARGET PREMISES ONE by ZELLA

 

### B.   <u>MICKIE SIMMONS IDENTIFIED</u>

31.     On March 8, 2022, an NSGTF Intelligence Analyst subpoenaed telephone records for telephone number ██████-1793, utilized by ZELLA, for the period March 1, 2022, through March 7, 2022, to identify the unknown individual that met with CHS-1 and ZELLA during the controlled purchase.

32.     The NSGTF Intelligence Analyst previously subpoenaed ZELLA's telephone number for call detail records for the period September 1, 2021, through November 21, 2021.  A frequency report was generated for this period to identify any contact in ZELLA's call detail record that may reside on Gay Road, Brookfield, Massachusetts.  The NSGTF Intelligence Analyst identified telephone number ██████-4208 through open-source databases as belonging to Mickie

SIMMONS (born 1991), residing at TARGET PREMISES TWO.  RMV records indicate that SIMMONS holds a Massachusetts Driver's License with the address of the TARGET PREMISES TWO listed as his residential address.  A vehicle query of the RMV system also revealed that SIMMONS has an active Massachusetts Vehicle Registration connected to this address as well.  A red Chevrolet Camaro bearing MA Reg: 1SXW53 is registered to SIMMONS at TARGET PREMISES TWO.  A subpoena was also submitted for telephone number ████-4208 to include subscriber and call detail records.   The subscriber records for ████-4208 showed Mickie SIMMONS, residing at TARGET PREMISES TWO.[5]

33.     On March 10, 2022, the NSGTF Intelligence Analyst received the results on both ████-1793 and ████-4208.  The NSGTF Intelligence Analyst generated a call detail report for March 7, 2022.  This report confirmed ZELLA (using 7███-1793), was in contact with ████-4208.   A 48-second call occurred between ████-1793 (ZELLA) and ████-4208 (SIMMONS) on March 7, 2022, at 2:28 p.m.  This is the timeframe during the controlled purchase in which ZELLA was receiving directions on where to meet SIMMONS for the controlled purchase.

34.     On May 5, 2022, investigators captured screen captures of SIMMONS' publicly viewable Facebook profile picture [see below photograph].

---

[5] TARGET PREMISES TWO is owned by Robert Angel.  While Angel and SIMMONS are visible together in photographs on various social medial platforms, their relationship to one another is unknown at this time.



**Mickie Simmons** (Dirtbikemic)                                    [Message]

Posts    About    Friends    Photos    Videos    Check-ins    More ▾                    ...

     35.     On March 27, 2022, SIMMONS posted a picture on his Facebook page standing next to his vehicle wearing a ski mask similar to the mask described by CHS-1 during the March 7, 2022, controlled purchase.  It should be noted this photograph was publicly viewable.

     [see below photograph screen captured on May 5, 2022]



As noted above, a red Chevrolet Camaro bearing MA Reg: 1SXW53 is registered to SIMMONS at TARGET PREMISES TWO.

C.   **CONTROLLED PURCHASE #2 – APRIL 12, 2022**

36.   On April 12, 2022, CHS-1 purchased two (2) PMFs and 15 rounds of 9 mm ammunition from ZELLA and SIMMONS.  Prior to the controlled purchase, CHS-1 and ZELLA negotiated via text message.  CHS-1 agreed to purchase two (2) PMFs along with ammunition for $2,630.  During the text exchange, ZELLA stated, "same meet as last time."

37.   Prior to the controlled purchas e, CHS-1 and CHS-2 met with agents at a pre-determined location.  CHS-1, CHS-2, and their vehicle were searched for contraband and currency with negative results.  CHS-1 and CHS-2 were provided audio and video recording equipment as well as $4,000 in official funds to complete the controlled purchase.

38.   Also prior to the controlled purchase, law enforcement set up in the vicinity of TARGET PREMISES ONE to conduct surveillance.  In addition, aerial surveillance was also conducted in the vicinity of TARGET PREMISES TWO by FBI air support during this controlled purchase.

39.   At approximately 1:02 p.m., ZELLA was observed outside of TARGET PREMISES ONE wearing a Boston Red Sox hat, a dark colored sweatshirt with yellow sleeves and sweatpants with a similar pattern.



Session 1: 4/12/2022 13:00:10 (16 min 17 sec)

Data | 4_12_2022_CHS_GUN_PURCHASE [1]



Session 1: 4/12/2022 13:00:10 (16 min 17 sec)

Data | 4_12_2022_CHS_GUN_PURCHASE [1]

[ZELLA outside of TARGET PREMISES ONE]

40.	At approximately 1:03 p.m., CHS-1 and CHS-2 arrived at TARGET PREMISES ONE.[6]  Surveillance agents observed ZELLA speaking to CHS-1 and CHS-2 outside of TARGET PREMISES ONE.  ZELLA entered the passenger-front-seat of the CHS vehicle.  The vehicle departed TARGET PREMISES ONE and a short time later turned back around and returned to TARGET PREMISES ONE.  CHS-1 and CHS-2 indicated that ZELLA forgot his cellular phone at TARGET PREMISES ONE, so they returned to retrieve ZELLA's phone.  The CHS vehicle then exited TARGET PREMISES ONE again and traveled to the area of TARGET PREMISES TWO.  Agents maintained their surveillance of the CHS vehicle.

41.	At approximately 1:38 p.m., the CHS vehicle arrived and parked at a dirt parking area across from power lines on Gay Road in Brookfield.  CHS-1 and ZELLA walked across the street to the power lines off Gay Road and met with SIMMONS.  CHS-2 remained in the vehicle.

42.	CHS-1 and ZELLA walked approximately 150 yards down the access road into the power line area.  SIMMONS walked out of a wooded area to meet with CHS-1 and ZELLA.  CHS-1's body recorder shows SIMMONS exiting a wooded area and meeting with CHS-1 and ZELLA.[7]

---

[6] CHS-2 served as the driver for CHS-1, as CHS-2 did during the previous controlled purchase.

[7] SIMMONS wore a mask covering the lower portion of his face.  CHS-1 told the agents during the debrief that SIMMONS' mask slid down a few times, showing the lower portion of his face.  I respectfully submit that the individual involved in this transaction was Mickie SIMMONS based on a totality of the circumstances, not based on an identification of SIMMONS made by CHS-1.



43.     In addition to body camera footage captured by CHS-1, FBI aerial surveillance video conducted at the same time showed SIMMONS exiting the wooded area adjacent to the power lines and meeting with CHS-1 and ZELLA.



44.     CHS-1 and ZELLA, and SIMMONS, approached one another on the dirt road. SIMMONS carried a black bag and wore a black hooded sweatshirt and a mask covering his face. According to CHS-1, the black bag contained two firearms and two magazines.



45.     CHS-1 exchanged $2,640 with SIMMONS.  In the body camera footage shown below,     SIMMONS     is     holding     the     official     funds     provided     to     CHS-1.



46.     CHS-1 asked SIMMONS about ammunition and SIMMONS indicated to CHS-1 that SIMMONS forgot to include ammunition but would travel back his house and get it.  ZELLA

and SIMMONS agreed to travel back to the house to retrieve the ammunition and meet back at the CHS vehicle to provide the ammunition to CHS-1. SIMMONS said he would give ZELLA a ride back home following the transaction. During the meeting, there was discussion of additional firearms SIMMONS had for sale. CHS-1 noted SIMMONS carried a loaded firearm on his person during the deal and the firearm had an extended magazine.



47. SIMMONS and ZELLA departed the meet location and walked through a wooded area back to TARGET PREMISES TWO. SIMMONS entered the back of TARGET PREMISES TWO and ZELLA walked around the front driveway of TARGET PREMISES TWO. ZELLA leaned on SIMMONS' vehicle. All of this is activity was captured on FBI aerial surveillance footage:



[ZELLA and SIMMONS walking in woods to TARGET PREMISES TWO]



[SIMMONS walking into back of TARGET PREMISES TWO]



[ZELLA waiting for SIMMONS]

48.     A short time later, SIMMONS exited TARGET PREMISES TWO and handed an item to ZELLA.  ZELLA walked on Gay Road to the CHS vehicle.  ZELLA next walked away from TARGET PREMISES TWO on Gay Road.  A short time later, SIMMONS picked up ZELLA on Gay Road in a red Camaro.  This vehicle bears Massachusetts Registration 1SXW53 which RMV records show to be registered to SIMMONS at TARGET PREMISES TWO. Agents maintained surveillance on SIMMONS' vehicle to the point in time when SIMMONS drops ZELLA off at TARGET PREMISES ONE.



[SIMMONS handing item to ZELLA]



[ZELLA at CHS Vehicle]



[SIMMONS picking ZELLA up on Gay Road]



[SIMMONS dropping ZELLA off at TARGET PREMISES ONE]

49.     After the controlled purchase, CHS-1 and CHS-2 met with agents at a pre-determined location.  CHS-1 and CHS-2 returned audio and video recording equipment as well as $1,360 in official funds that were not needed to complete the controlled purchase and the firearms and ammunition.

50.     The evidence was subsequently turned over from CHS-1 to case agents.  The evidence consisted of:

      a.  One (1) 9mm handgun with a gray slide and black frame along with one empty magazine

      b.  One (1) 9mm handgun with a black slide and gray frame along with one empty magazine

c. One (1) clear plastic bag containing fifteen (15) rounds of 9mm ammunition

 



**D.    CONTROLLED PURCHASE #3 – MAY 4, 2022**

51.    On May 4, 2022, CHS-1 purchased one (1) PMF, three (3) magazines and three (3) rounds of 9mm ammunition from ZELLA. Prior to the controlled purchase CHS-1 and ZELLA negotiated via text message and phone calls. ZELLA utilized telephone number █████ ███-1793 to orchestrate the controlled purchase. ZELLA agreed to sell the PMF equipped with a laser, three magazines, and three rounds of 9mm ammunition in exchange for $1,400. ZELLA sent photographs of the PMF and magazines to CHS-1.



[Photographs of PMF and magazines sent to CHS-1 from ZELLA]

52.     Prior to the controlled purchase, CHS-1 and CHS-2 met with agents at a pre-determined location.  CHS-1, CHS-2, and their vehicle were searched for contraband and currency with negative results.  CHS-1 and CHS-2 were provided audio and video recording equipment as well as $1,400 in official funds to complete the controlled purchase.

53.     Also prior to the controlled purchase, law enforcement set up in the vicinity of TARGET PREMISES ONE to conduct surveillance.

54.     ZELLA directed CHS-1 to TARGET PREMISES ONE.[8]  At approximately 11:50 a.m., ZELLA texted CHS-1 and indicated that he would be late.  At approximately 12:38 p.m.,

---

[8] Again, CHS-2 served as the driver for CHS-1, as CHS-2 did during the two previous controlled purchases.

ZELLA texted CHS-1 indicating that ZELLA was ready and directed CHS-1 to come to TARGET PREMISES ONE. CHS-1 and CHS-2 traveled to TARGET PREMISES ONE under surveillance. At approximately 12:46 p.m., ZELLA was positively identified by surveillance as he arrived home at the TARGET PREMISES ONE and entered the residence. At approximately 12:47 p.m., CHS-1 and CHS-2 arrived at TARGET PREMISES ONE.

55.     A short time later, ZELLA exited TARGET PREMISES ONE holding a white box. ZELLA entered the rear passenger seat of the CHS vehicle. The CHS vehicle drove to a lot a short distance away then turned around and reversed direction. The CHS vehicle then bypassed TARGET PREMISES ONE and drove to another parking lot a short distance away to turn around again and return to TARGET PREMISES ONE. At approximately 1:03 p.m., ZELLA exited the CHS vehicle and entered TARGET PREMISES ONE. The CHS vehicle departed the area under surveillance and returned to a pre-determined briefing location.

56.     After the controlled purchase, CHS-1 and CHS-2 met with agents at a pre-determined location. CHS-1 and CHS-2 returned audio and video recording equipment along with the firearms and ammunition purchased. The sale price was $1400, the same amount provided beforehand by agents; thus there were no remaining official funds to return.

57.     The evidence was subsequently turned over from CHS-1 to case agents. The evidence consisted of:

    a.  One (1) black and gray 9mm PMF with a Polymer80 Inc. frame, Model #PF940V2 with a Gamo laser sight attached.

    b.   Three (3) PMag ten round magazines; two (2) empty, and one (1) containing three (3) rounds of 9mm ammunition

c. A white Samsung Galaxy Tab A8 box [items a and b were concealed within this box]

 



E. **ADDITIONAL COMMUNICATIONS WITH ZELLA**

58.     On May 18, 2022, CHS-1 contacted law enforcement officers to report that CHS-1 had a telephone conversation with ZELLA in which ZELLA stated he was currently in possession of eight firearms, including a fully automatic MAC-10, known to law enforcement to be a Military

Armament Corporation Model 10, and a 100-round drum magazine. ZELLA stated he would sell CHS-1 the firearm for approximately $5,000.  This telephone call was not recorded.[9]

### F.  INSPECTION OF THE PMFS AND AMMUNITION

59.     On May 12, 2022, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") conducted an inspection of the PMFs and ammunition sold to CHS-1 by ZELLA and SIMMONS during the three controlled purchases and determined that all four are firearms as defined in Title 18, United States Code, Chapter 44, Section 921(a)(3).  It was also determined that the ammunition sold to CHS-1 by ZELLA and SIMMONS was commercially-manufactured ammunition.  Because there is no commercially-manufactured ammunition produced in Massachusetts, the ammunition sold by ZELLA and SIMMONS to CHS-1 in Massachusetts necessarily traveled in interstate commerce.

60.     Furthermore, the ATF SA determined through a records check that neither ZELLA nor SIMMONS possesses  a Federal Firearms License to manufacture or deal in firearms, and thus are not a licensed dealer within the meaning of Title 18, United States Code, Chapter 44.

### G.  FIREARM TRAFFICKERS USE OF RESIDENCES

61.     As established above, there is probable cause to believe that ZELLA and SIMMONS violated 18 U.S.C. § 922(a)(1)(A), and 18 U.S.C. § 922(g)(1), and to believe that

---

[9] On May 9, 2022, ZELLA contacted CHS-1 and indicated that ZELLA obtained a new phone number: ████-0918.   An analyst determined this is a TracFone that was activated on May 8, 2022.   Agents have not yet received tolls for this phone.

evidence of these offenses will be found at the TARGET PREMISES ONE and TARGET PREMISES TWO.

62.     Based on my training and experience, I know that individuals who own and possess firearms frequently possess and maintain them for long periods of time because firearms are somewhat expensive and do not easily wear out.  Firearms are often similar to tools that a person buys and maintains.  Persons who own and possess firearms generally keep them in their residences unless carrying in their possession outside of the residence. It has also been my experience that persons maintain firearms along with ammunition in a convenient and safe location to afford ease of access.

63.     Based on my training and experience, I also know that those involved in the trafficking and sale of firearms often maintain firearms and ammunition while in the process of arranging sales for the firearms and ammunition. Those engaged in the business of selling firearms also frequently maintain records such as ledgers, receipts, and other documentation of their acquisition or sale of the firearms and ammunition. Based upon my training and experience, I know that those engaged in the sale of firearms often possess firearms parts, accessories, and equipment to either sell or to maintain the firearms they possess.

64.     Based on my training and experience, I know that individuals who make or sell PMFs often order the parts used to make such PMFs from various manufacturers or distributors, and often have communications, shipping materials, payment records, or other documentation reflecting their ordering of, receipt of, and/or payment for these parts.

65.     Based on my training and experience, I know that individuals engaged in the business of selling firearms frequently use electronic devices (including smartphones, tablets, or computers) in furtherance of that business, including to communicate with suppliers, potential

suppliers, customers, and potential customers; to research firearm specifications, availability, and pricing; to make arrangements for the acquisition, transportation, or sale of firearms; and to track revenue and expenditures. From my training and experience, I know that individuals frequently keep cell phones, computers, business records, banking records and other similar items in their residences.

### SPECIFICS OF SEARCH AND SEIZURE OF COMPUTERS/CELL PHONES

66.     Based on my training, experience, and information provided by other law enforcement officers, I know that many cell phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers. Phones have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages and emails, and storing a range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence of communications and evidence of communications and evidence that reveals or suggests who possessed or used the device.

67.     From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computers to create and store records of their actions by communicating about them through e-mail, instant messages, and updates to online social-networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online.

68.     From my training, experience, and information provided to me by other agents, I am aware that businesses frequently use computers to carry out, communicate about, and store records about their business operations. These tasks are frequently accomplished through sending

and receiving business-related email and instant messages; drafting other business documents such as spreadsheets and presentations; scheduling business activities; keeping a calendar of business and other activities; arranging for business travel; storing pictures related to business activities; purchasing and selling inventory and supplies online; researching online; and accessing banking, financial, investment, utility, and other accounts concerning the movement and payment of money online.

69.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet.  This is true because:

   a.  Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

   b.  Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c.  Wholly apart from user-generated files, computer storage media, in particular, computers' internal hard drives contain electronic evidence of how the computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

   d.  Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

70.     Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized. This is true because of:

   a.     The volume of evidence — storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

   b.     Technical requirements — analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data. Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

71.     The premises may contain computer equipment whose use in the crime(s) or storage of the things described in this warrant is impractical to determine at the scene. Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge. In

addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant.  If the things described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

72.     The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B.  If however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.   The authority to search is limited to the property of ZELLA and SIMMONS.

## UNLOCKING A DEVICE USING BIOMETRIC FEATURES

73.     The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

    a.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped

with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g. Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of ZELLA or SIMMONS; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## **CONCLUSION**

74.     Based upon the foregoing, as well as my training and experience, I submit that there is probable cause to believe that between March 7, 2022, and May 4, 2022, Zachary ZELLA and Mickie SIMMONS were both felons in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1), and that they both engaged in the unlicensed dealing of firearms, in violation of 18 U.S.C. § 922(a)(1)(A).    Accordingly, I respectfully request that this Court issue criminal complaints charging Zachary ZELLA and Mickie SIMMONS with a violation of 18 U.S.C. § 922(a)(1)(A) and 18 U.S.C. § 922(g)(1).

75.     Furthermore, based on the information described above, I believe that the TARGET PREMISES ONE and TARGET PREMISES TWO, as described in Attachments A-1 and A-2, respectively, contain evidence, fruits, and instrumentalities of possession of ammunition by convicted felons and unlicensed dealing in firearm, as described in Attachment B. Accordingly, I respectfully request that search warrants be issued for the search of TARGET

PREMISES ONE and TARGET PREMISES TWO, as described in <u>Attachments A-1</u> and <u>A-2</u>.

I declare that the foregoing is true and correct.

_Michael C. Alvarado/DdV_

Michael C. Alvarado
FBI TFO

Time and Date:  **May 25, 2022**        4:50 p.m.

Notice is hereby provided that, pursuant to Federal Rule of Criminal Procedure 4.1, the affiant was sworn by telephone on the date and time indicated above and on the search warrant issued by the Court.

_David H. Hennessy_

HONORABLE DAVID B. HENNESSY
United States Magistrate Judge